## Court for the Correction of Errors

### OF THE

## STATE OF NEW-YORK,

DURING THE YEAR 1832—EMBRACING A FEW CASES HEARD IN THE
WINTER SESSION OF 1833.

---

Concluded from volume Ninth.

---

## JACKSON, ex dem. Fitz Simmons, *vs.* FITZ SIMMONS.

Where a person seised of real estate died intestate without issue, and a question arose whether the whole of his estate should go to his brother, who had been *naturalized*, or whether a *nephew*, who also had been *naturalized*, but whose father died an *alien*, should come in for a part, *it was held*, that the brother was entitled to the whole, and that the nephew being obliged to trace his descent through his father, who was an *alien*, could not claim any portion of the estate ; the intestate having died previous to the 1st January, 1830, until when, the provisions of the statute, 11 and 12 *Wm.* 3, *ch.* 6, enabling parties to inherit, notwithstanding their ancestors through whom they derived title were aliens.

The fifth canon of the statute of 1786, *regulating descents*, does not confer the capacity upon *alien* nephews and nieces to inherit lands.; its only effect is to alter the rule of descent as it existed at the common law.

ERROR from the supreme court. *Patrick Fitz Simmons* brought an action of ejectment in the supreme court for the recovery of a *moiety* of 200 acres of land, whereof his uncle, *Felix Fitz Simmons*, died seised in 1828, and whereof the defendant, *Thomas Fitz Simmons*, a brother of the deceased, and uncle of the lessor of the plaintiff, was in possession. Felix was a *naturalized citizen*, died intestate, and left no issue. In

VOL. X. 2

ALBANY,
Dec. 1832.

Jackson
v.
Fitz Simmons.

his life time he had five brothers and two sisters,—all aliens; one of his brothers, *Thomas,* the defendant in this cause, having come to this country, was *naturalized* in 1810; and in 1824, *Patrick,* one of seven children of *Hugh Fitz Simmons,* the eldest brother of Felix, also was *naturalized,* having previous to that time resided in this country several years. Hugh Fitz Simmons died in 1820, he and all his children at the time of his death being aliens. The cause was tried, and the above facts were found in a special verdict. The supreme court gave judgment for the defendant. For the reasons of their decision, see the opinion of the court in *Jackson* v. *Green,* 7 *Wendell,* 333. The plaintiff sued out a writ of error.

The cause here was argued by

*A. Van Vechten,* for the plaintiff in error.

*I. Williams,* for the defendant in error.

The counsel for the plaintiff in error insisted upon the following points :

1. The lessor having been naturalized before the death of the intestate, the *fifth canon* of descent of the *statute regulating descents,* passed in 1786, 1 *R. L.* 52, 3, cast the inheritance directly upon him, and the alienage of his father at the time of his death cannot affect the lessor's right to take.

2. The reference to the share of the father in the statute is for the purpose merely of determining the *quantum* of interest, and does not affect the right to inherit.

3. The lessor being the only one of his father's children capable of taking, he represents the whole quantum of interest his father would have taken had he been living and capable of inheriting, and he is therefore entitled to an equal *moiety* of the estate.

The following opinions were delivered :

By the CHANCELLOR. The premises in controversy in this case formerly belonged to Felix Fitz Simmons, a naturalized citizen, who died in 1828 intestate and without issue. At the time of his death, he left several brothers and sisters, all of

whom were aliens, except the defendant in this suit, who claims the real estate of the decedent as the sole heir at law who was capable of inheriting it by descent.   The decedent, at the time of his death, also left several nephews and nieces, the children of a deceased brother, none of whom were naturalized except Patrick Fitz Simmons, the lessor of the plaintiff; and the only question presented for our decision in this case is, whether the lessor of the plaintiff could inherit any part of the real estate of his uncle Felix, he being obliged to trace his relationship through his own father, who was never naturalized.

By the common law, an alien could neither receive or transmit lands by descent; nor could he interrupt the descent of the inheritance to others, and real estate was transmitted by descent to the next heir, in the same manner as if such alien had never been in existence, except that if the alien had children born within the king's allegiance, or such children were naturalized, they might inherit from each other.   *Burt on Real Prop.* 111, *pl.* 331.   2 *Kent's Comm.* 54.   If the land descended to the next heir immediately, as from brother to brother, and not mediately or by representation, it was no objection to the vesting of the title in the immediate heir by descent, that such heir and the person from whom the estate descended had no common or inheritable blood, except such as was derived from a common ancestor who was an alien. But if the first immediate heir was an alien, so that he could not have inherited the estate if living, those who could only claim through him by representation, and not as the next immediate heirs to the deceased owner of the estate, were also passed by, and they could not inherit by representation through the blood of such alien.   That such was the rule of the common law is proved by the decision of the judges in the court of exchequer chamber in England in 1664, in the case of *Collingwood* v. *Pace,* 1 *Keble's R.* 603, 670, 699 ; 1 *Ventris,* 413 ; *O. Bridgman's R.* 410, *S. C.*   The principal question in that case, and upon which there was a difference of opinion among the judges, was whether two brothers being naturalized, the one could inherit lands by descent from the other, their parents being aliens.   Sir O. Bridgman, chief justice,

and Sir Thomas Tyrill, one of the junior judges of the court of common pleas, held that they could not, as they must trace their relationship to each other through the blood of their alien parents. Sir Robert Hyde, chief justice of the king's bench, Sir Matthew Hale, chief baron of the exchequer, and several other judges, held a contrary opinion on this point; and they decided that the descent from brother to brother was immediate, and not by representation through the alien father, as the father could in no case be heir to his son. All the judges, however, agreed that a natural born or naturalized son of the eldest brother, who was an alien at the time of his death, could not inherit as the heir at law of the uncle, because he was obliged to claim by representation through the blood of his alien father. The preamble to the statute, 11 and 12 *William 3d, ch. 6,* 1 *Evans' Stat.* 228, recognized this rule of the common law, and provided for future cases in England. As that statute was not re-enacted in this state after the revolution, when the general act was passed abolishing all British statutes, if its provisions were extended to this part of the king's dominions, it was not in force here for the last forty years, until a section providing for future cases of this description was incorporated into the recent revision of the laws. As the whole of this subject has been very ably examined by Chief Justice Savage, in the recent case of *Jackson* v. *Green*, in the supreme court of this state, 7 *Wendell's R.* 333, and by Mr. Justice Story in the case of the *Lessee of Levy* v. *McCartee*, 6 *Peters' R.* 108, it is not necessary to take up any further time in the discussion of this question.

It is insisted, however, on the part of the plaintiff in error, that if the rules of the common law precluded the nephew from taking lands by descent from his uncle through the alien father by representation, our own statute of descents, which was in force in 1828, had provided for this particular case, and that the lessor of the plaintiff was entitled to inherit a moiety of the premises in question, under the provisions of the statute. The provision referred to is the fifth canon of descent, as prescribed by the act of the 23d of February, 1786, 1 *R. L. of* 1813, *p.* 53, and is as follows : " *Fifthly,* in case any such brother or sister, *who would have inherited by this law if liv-*

ALBANY,
Dec. 1832.

Jackson
v.
Fitz Simmons.

*ing*, shall die before the said person so seised, and leave a lawful child or children, such child or children surviving the said person so seised shall inherit, if a child, solely, and if children, as tenants in common, in equal parts, such share as would have descended to his, her or their father or mother, if such father or mother had survived the person so seised." It is evident, from the language of this clause of the statute, that it cannot help the lessor of the plaintiff in this case, because the children of a deceased brother are only to have such share of the estate of their uncle or aunt as their own father or mother would have inherited if living. The father in this case being an alien, no share would have descended to him if living, because the law never casts the estate upon a person who cannot legally hold it, except in the case of an attainder for the benefit of the crown. The true answer, however, to all claims under the statute of descents, contrary to the rules of the common law, is, that the statute was only intended to change the common law canons of descent. It is not an enabling statute to give capacity to persons to take by descent in cases where, by the common law, they were incapable of inheriting by reason of alienage or other disability. If a literal interpretation were given to the fourth canon of descent, as prescribed by this statute, it would cast the greatest portion of the premises in question here, upon the alien brothers and sisters of the person last seised, and the lessor of the plaintiff, under the fifth cannon, would share equally with his alien brothers and sisters, as tenants in common of his deceased father's share, which would give him but one thirty-sixth part of the premises. Such was never the intention of the legislature, and giving such a construction to the provisions of the statute would unsettle the titles to property of immense value in this state.

I am satisfied the decision of the supreme court was correct in this case, that Patrick Fitz Simmons took nothing by descent from his uncle Felix, and that the judgment should be affirmed.

By Mr. Senator ALLEN. It was contended by the plaintiff in this cause, that he being a naturalized citizen, before the death of the intestate, the alienage of his father at the time of his death, cannot affect his right to inherit, as the fifth canon of descent of the act of 1786, 1 *R. L.* 52, casts the inheritance directly upon him. It appears by the finding of the jury, that Felix Fitz Simmons, a naturalized citizen, died seised of about 200 acres of land in the county of Saratoga ; that he left no issue, and died intestate. The plaintiff, Patrick Fitz Simmons, is the son of Hugh Fitz Simmons, who died in Ireland about eight years before the intestate. Hugh was the oldest brother of Felix, and at the time of his death was an alien. Thomas Fitz Simmons, the defendant, is also a brother of Felix, the intestate, and both Patrick and Thomas were naturalized before the death of Felix.

The provisions of the act, under which the plaintiff claims, are as follows : If a person seized of land shall, after the death of his father, die without lawful issue, leaving a brother, or brothers, or sister or sisters, the inheritance shall descend to such brothers or sisters, as the case may be, in equal parts ; and if such brother or sister, who would inherit by this law, if living, shall die before the person so seised, and leave lawful children surviving the person so seised, such children shall inherit as tenants in common, the share that would have descended to their father or mother, if he or she had survived the person so seised. If this statute could be construed as extending its provisions to *aliens*, there would be no question as to the claim of the plaintiff under it. But, if the claim of the plaintiff be recognized, then upon the same principle, the claim of all the brothers and sisters of his father, and their offspring, must be equally valid. The act, however, was evidently intended to operate on natural born, or duly naturalized citizens only. It appears to me inconsistent with every principle of correct policy, that the construction contended for by the plaintiff should prevail. The privileges granted, in numerous instances, to aliens, permitting them to hold and convey real estate, are favors conferred, not rights to which they have a claim. An alien may hold, convey, and bequeath his personal estate, and is protected by our laws from violence and in-

justice to his person and property, mainly because personal estate is of a transitory nature, and the indulgence conduces to the advancement of trade and commerce. An alien enjoys many of the civil privileges of citizens, without being subject to their duties, for he is exempt from serving on juries, or training in the militia. If in addition, he could acquire permanent property in lands, it is but just and reasonable that he should owe an allegiance to the state, equally permanent with the property. Now the absurdity of the construction contended for is, that Hugh, an alien, if he had been living, would have become proprietor of a portion of the real estate left by the intestate, while at the same time he not only owed allegiance to, but resided under, a foreign government; for it is folly to say that the estate descended through him to the plaintiff, if he was not capable of inheriting and holding it in his own right. In *Borst* v. *Becker*, 6 *Johns. R.* 332, the defendant below objected to two of the jurors, on the ground of their being aliens; the objection was overruled by the judge, he considering their being freeholders as a sufficient qualification. The supreme court held that the words of the act are, that the constable shall summon twelve good and lawful men, being freeholders, as a jury; and though the two jurymen were freeholders, they were not good and lawful men, within the meaning of the statute. I might refer to many statutes where, if the construction contended for by the counsel for the plaintiff was to prevail, aliens may be substituted for citizens, in numerous instances; but the legislature have not deemed it necessary, where persons were to be selected or appointed for a specific purpose, to declare that they must be citizens, or that the provisions of the act related to citizens only, when aliens are not alluded to.

As the case under consideration is not provided for by the statute, we must look to the common law for our guidance. Aliens are incapable of taking by descent, or inheriting, for they are not allowed to have any heritable blood in them; wherefore, if a man leaves no other relations but aliens, his lands will escheat. 2 *Black. Comm.* 249. An alien may take by purchase, and may maintain an action for the land, which cannot be defeated by the defendant, on the ground of

the plaintiff's alienage ; but the people may interfere, and di-
vest the alien of his title, by office ; and no title vests in the
people until office is found.    An alien, however, cannot take
by descent, curtesy, or dower, or by any other title created by
act of law.    *Gansevoort* v. *Lunn, 3 Johns. Cas.* 109.    It would
seem, therefore, by the above authorities, that the ancestor of
the plaintiff being an alien, could not inherit the estate left by
his brother Felix, because he had not in him any inheritable
blood.    In *Levy* v. *McCarty,* 6 *Peters,* 102, Judge Story held,
that an alien has no inheritable blood, and can neither take
land himself by descent, nor transmit land from himself to oth-
ers by descent ; which the judge considers common learning,
and requires no reasoning to support it.    If any mediate an-
cestor through whom the party makes his pedigree, is an alien,
that is a bar to his title as heir.    It cannot, it appears to me,
be necessary to pursue the subject further, as the result plain-
ly is, that Thomas Fitz Simmons being a naturalized citizen
previous to the death of his brother Felix, was his rightful
heir, to the exclusion of Patrick, who could only claim inher-
itance through his father, an alien, and who by law being in-
capacitated to inherit himself, could not transmit an inherit-
ance to his heirs.    Where there is a failure of inheritable blood,
by reason of alienism, the lands do not escheat but go to the
next heir.    7 *Johns. R.* 214.    The judgment of the supreme
court ought to be affirmed.

By Mr. Senator SEWARD.    I do not understand the counsel
for the plaintiff in error to contend that the decision of the
supreme court is erroneous in principle, if the court be correct
in assuming that the case presented by the special verdict is
without the provisions of the act of 1786.    The supreme
court are sustained by abundant authority, extensively quot-
ed by them, as well in our own as the English courts, that at
common law a naturalized citizen cannot take, when he must
derive his inheritable blood through an alien ancestor, al-
though the alien ancestor was dead at the time of descent cast ;
and as the act of *William* was not until the revision enacted
in this state, the plea of alienage was not removed by any stat-
ute.    But it is contended that the present case is within the

fifth canon of descent established by the act of 1786, 1 *Rev. Laws of* 1813, p. 52, 53. And it is insisted that by operation of that canon the descent was cast directly and immediately from the Intestate to Patrick Fitz Simmons, the lessor of the plaintiff. It is a question of sound construction of the statute —is important—and new.

ALBANY,
Dec. 1832.

Jackson
v.
Fitz Simmons.

It having been declared by the fifth canon that "in case the person seised of the estate shall after the death of his or her father, die without lawful issue, leaving a brother or brothers and a sister or sisters, the inheritance shall descend to such brother or brothers and sister or sisters as the case may be, as tenants in common, in equal parts ; the fifth canon proceeds to direct that, " In case any such brother or sister who have inherited by this law, if living, shall die before the said person so seised and leave a lawful child or children, such child or children surviving the said person so seised shall inherit, if a child solely, and if children, as tenants in common in equal parts, such share as would have descended to his, her, or their father or mother, if such father or mother had survived the said person so seised."

The construction contended for by the counsel for the plaintiff in error seems forced against the common sense purport of the act. The person who may inherit under the fifth canon must be the child of any such brother or sister *who would have inherited by this law* if living. Now, Hugh Fitz Simmons the father of the lessor of the plaintiff died an alien. Had he survived the intestate, still continuing an alien, he could not have inherited by this law. It is true he might, had he lived, have become naturalized so as to have taken on the death of the intestate, but so *might* all the brothers and sisters of the intestate. To me it seems that the lessor of the plaintiff claiming the benefit of this statute, must affirmatively show all the circumstances necessary to bring himself within it. He must show first, his own capacity to take (if the plea of alienage to himself be interposed ;) he shows that he is naturalized, and that establishes his capacity to take. He must show secondly, his consanguinity in the relation to the intestate prescribed by the act, that of the child of a brother or sister of the intestate : the special verdict establishes this point also. But

this is not enough, he must show further that he is the child of a brother or sister who *would have inherited by this law if living.* Now, unless all aliens can take under this law, Hugh Fitz Simmons, his father, if living could not take under this statute. He fails, therefore, to show that essential requisite. And this view of the case is supported by the declaration of the canon as to the quantum of interest, that such child or children shall inherit ; it is such share as would have descended to his, her, or their father or mother, if such father or mother had survived the said person so seised. The plain import of the fifth canon seems to me to be, to provide that the children of a person who, if living, would be an heir, shall, if such person be dead at the time of the descent cast, take the portion which such person if living would have taken. In opposition to this view of the case, it is contended by the counsel for the plaintiff in error that the fifth canon of descent casts the inheritance directly upon the lessor of the plaintiff, and that he inherits directly from his uncle, and not through his father, who was dead at the time of descent cast. To this argument, however, it is a sufficient reply, that the lessor can take only by force of the canon ; and the canon admits him to take, only in case his father could have taken had he been living. To remove this objection, the counsel for the plaintiff contends that the statute means only *to define the consanguinity of the person who is to take,* and that this consanguinity being traced, the inheritance without being supposed to follow down the channel of blood or pedigree, descends at once by operation of the statute. And this ground is fortified by the argument that it is an absurdity to say that the nephew takes as heir from his father, who was dead at the time of the descent cast, and therefore never did take. Nevertheless this absurdity is one which is too plainly recognized at common law, and forms a protection to too many estates, to leave us at liberty to question it. At common law inheritance is well understood to descend through the channel of blood or consanguinity, and when that blood is corrupted by alienage or infamy, the inheritance is altogether obstructed or diverted into a different channel. To sustain the argument of the counsel for the plaintiff then, we must assume that the statute intends

to take away the plea of alienage, and to overrule in this respect a principle of the common law. That assumption might properly be made if the statute could in no case have operation, unless the common law principle was overruled. But such is not the case. The statute has full and complete operation in all cases where a person having capacity to take, traces his inheritable blood unobstructed through the channel of consanguinity. In my mind it cannot admit of doubt, therefore, that we are to consider the statute applicable only to those cases in which it can have operation, without overruling a principle of the common law not necessarily repealed by it. Indeed the same principles of construction which would enable the lessor of the plaintiff to take, notwithstanding the alienage of his father would allow him to take, although an alien himself.

It is contended that the benignant spirit of our laws should have an influence in inducing us to construe this act against the operation of the plea of alienage. I think differently; the act of 1784 admits the correctness of all the common law rules of descent, except those specially abolished, because it goes on to direct that in all cases not particularly provided for by this act, the common law shall govern. Such was the law until the revision of 1830, and we are bound to sustain the common law principle by the superadded sanction of legislative authority.

I am therefore of opinion that the judgment of the supreme court ought to be affirmed.

By Mr. Senator TRACY. The question in this case is, can a citizen, whose father was an alien, inherit the land of his uncle, a citizen, who survived the father?

At common law it was insisted that an alien could neither take nor be a medium for transmitting real estate from and to natural born subjects. "The politic grounds," as they are termed, why an alien could not inherit in England, are given in *Calvin's case, 7 Coke's R.* 1, and are curious as indicating the genius and spirit of the times when this illiberal principle was established. They are briefly as follows: 1. The secrets of the realm might be thereby discovered. 2. The revenues of the realm (the sinews of war and ornaments of

ALBANY,
Dec. 1832.

Jackson
v.
Fitz Simmons.

peace) would be taken and enjoyed by strangers. 3. It tendeth to the destruction of the realm by admitting strangers to fortify in the heart of the kingdom.

Why a title could not be transmitted to a natural born subject, if his consanguinity with the person last seised was traced through an alien, arose from the common law fiction that all estates descended from indefinite ancestors, and had vested successively in every person who helped to form the chain of consanguinity between the person claiming and the person last seised. The application of this fiction of the common law to defeat natural born subjects of their inheritance, had originally, it is probable, no worthier motive than that of swelling the royal exchequer by escheats ; but however this may be, it seems to be considered settled law as early at least as the days of Lord Coke, who lays it down, that if there be two sons subjects, the father an alien, and one of the sons be seised of land and die, the other cannot inherit, because there is no inheritable blood between the father and the sons. But shortly after a contrary rule prevailed in *Hobby's case*, which contains the first express adjudication I have been able to find in favor of the *immediateness* of the descent between brother and brother ; but it was not until the final decision in the greatly contested and elaborately argued case of *Collingwood* v. *Pace*, 1 *Ventris*, 413, that the principle is deemed fully established. This case, which is given in several reports, but most fully by Ventris, and in Chief Justice Bridgman's judgments, edited by Bannister, seems to be the first and the last in which the subject has been fully examined, and is the fountain from whence all subsequent reasonings have been drawn. The distinction it establishes, which allows one brother to succeed as heir to another, though the father was an alien, and does not allow a grand child to inherit from his grand father, because his father was an alien, to say the least is very subtle, and, as far as I can perceive, unfounded in law or reason ; at any rate, the reason given, which is that in one case the descent is *mediate* and in the other *immediate*, is more fanciful than satisfactory ; for admitting, as urged by Lord Hale, that one brother takes directly from the other, and not by representation from the father, yet their consanguinity

(and it is in consequence of consanguinity that he takes at all) arises not from one another but from their father, " which is the common *vinculum* to both ; and besides, as is stated in the same case, a descent from the grand father, who dies in possession, to the grand child, (the father being dead,) or from the uncle to the nephew, (the brother being dead,) are deemed *immediate* descents, although the one is collateral and the other lineal, for the heir is in in the *per* and not in the *per* and *cui*. But without entering into the nice distinctions, originating in subtleties and productive of confusion, which were attempted to be drawn in this case between the terms mediate and immediate as regards the *mediateness* or *immediateness* of the *estate* or *right*, and the mediateness or immediateness of *pedigree* or *consanguinity*, that there was a distinction between a descent from brother to brother, and a descent from grand father to grand son, or from uncle to nephew, where the father was an alien, is positively decided. How far the fact, that the descent sought to be sustained in that case was from brother to brother, influenced this distinction, and whether, if it had happened to be a descent from grand father to grand son, (the father being dead,) or from uncle to nephew, (the brother being dead,) it might not have been ruled so as to have sustained the inheritance against the operation of a law which even at that early day was deemed severe and unjust, is probable at this time as useless to speculate on, as it would be hopeless to arrive at a certain conclusion. It is enough for the present purpose that the old rule of the common law, that alienism in either of the parties to a descent, or in any intermediate ancestor through whom the descent is supposed to be made, will prevent it taking effect ; and that it so remained until the statute of the 11 and 12 *Wm.* 3, appears most distinctly from the preamble to that statute, although I cannot find any decisions intervening the case in Ventris and the passing of the statute. This statute, by removing entirely the disability produced by the alienism of an intervening ancestor, either lineal or collateral, took away from the judiciary of England all occasion or motive for further ameliorating the harshness of the common law by extending the principle of immediate descents to other cases,

ALBANY,
Dec. 1832.

Jackson
v.
Fitz Simmons.

which every one perceives to be analogous in principle to that of *Collingwood* v. *Pace.* Had it not been for this circumstance, I have no doubt that this subtle destinction would long ago have been abolished by judicial decisions, and there would have been adopted in place of it a liberal principle, sustained by such sensible views as are presented by Blackstone, who, speaking in reference to this very distinction, says, that "as in the case of common purchasers, the whole of the supposed descent from indefinite ancestors is but fictitious; the law may as well suppose the requisite ancestor as to suppose the requisite descent."

By some oversight, not very explicable, the statute 11 and 12 William 3, although adopted by several of the states, was never adopted in this until the last revision; and in consequence of this omission, it would seem that we, with institutions and policy diametrically opposed to the old feudal doctrine of alienism, have been all the time subject to the harsh operation of an arbitrary rule established centuries ago, under circumstances exactly the reverse of those in which we have been placed, and this too without the advantage we have possessed as respects most other maxims of by-gone days—that of having had them gradually mollified and conformed to the notions and necessities of modern times by the liberal expositions of an enlightened judiciary, which all the mean time has occupied the benches of the English courts. Under these circumstances, and in the absence of any authorities in our own courts, and in fact any in the courts of England since the case of *Collingwood* v. *Pace,* I should have been inclined to struggle hard before I yielded to the conclusion that this old and practically exploded rule of the English law had remained in full force and operation in this state; and if this question were now open, I should search with diligence and anxiety for some evidence to the contrary. But the late case of *Jackson* v. *Green,* in our supreme court, the opinion in which has been adopted and printed as the opinion of the court in this case, and the still later case of *Levi* v. *McCartee,* in the supreme court of the United States, reported 6 *Peters,* 102, are authorities directly to this point; and although they perhaps

are not absolutely controlling upon our decision, yet the very high character of the two courts, and the full examination they have given the question, constrain me to admit what otherwise I should not without doubt and reluctance, that the rule of the common law laid down in *Collingwood* v. *Pace*, which disables a son of an alien, though himself a subject, from inheriting the estate of his uncle, continued to be the law of this state (notwithstanding the statute of 11 and 12 William 3) up to and at the time of the descent cast in the present case.

But the point upon which the counsel for the plaintiff has seemed mainly to rely is, that in this case the father having died before the uncle, the inheritance was cast by virtue of the fifth canon of our statute of 1786, regulating descents, directly upon the plaintiff, he being at the time of the uncle's decease a citizen capable of taking real estate. After a careful examination of this statute, 1 *vol. of R. S. of* 1813, *p.* 52, I can find nothing to justify this conclusion. The object of this part of the statute was confined to changing the common law rules of descent, and it was not designed, so far as I discover, to affect any ability or disability of inheriting. In this respect the personal or consanguineous disabilities remained as at common law. The object of the fifth canon in particular was to sustain the doctrine of inheritance *per stirpes* by collaterals ; and it carries this principle further than it is carried in the case of lineal descent, and further than was carried in the civil law, from which the principle of it was copied. See *Jackson* v. *Thurman*, 6 *Johns. R.* 322. It tends consequently, if any effect is to be given to it in this respect, to a closer application of the common law rule relative to the intervention of an alien ancestor, inasmuch as it makes the *vinculum* between the ancestor last possessed and the relation who claims, more distinct and important. So, if at common law there might be a doubt whether the descent from uncle to nephew (the father being dead) was not *immediate*, this canon seems to take away that doubt, by declaring that such child or children shall inherit such share " as the parent would have inherited if living," thus interposing the father as a *stirpes* and an indispen-

sable standard by which the extent or quantity of the child's inheritance shall be measured.    And the argument pressed by the plaintiff's counsel, that these words are used only to designate the *quantum* of the child's estate, and are not intended to affect the question of the *mediateness* or *immediateness* of the descent, if sound, has unfortunately no other effect than to bring the question directly back to the common law rule that governs it, and the disability to inherit through an alien father recurs with its original force.    The reply attempted, that the statute etablishes the relation between the uncle and the nephew, and therefore gives the estate directly from the one to the other, without regard to the alien disability of the intervening ancestor, proves too much, as by the same reasoning the inheritance must go to the nephew, though he were himself an alien ; for there are no express words in the statute to exclude aliens from taking, and we might as easily infer that it cured the alien disability to receive, as that of being the medium through which the estate was transmitted.    Indeed, I can find nothing in these canons to justify an opinion that they change or in any way affect the rule of the common law, which otherwise would govern the present case, and therefore am for affirming the judgment of the supreme court.

It being the unanimous opinion of the Court that the judgment of the supreme court ought to be affirmed, it was accordingly *affirmed*.